UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

        Plaintiff,               Case No. 25-cr-20164

  v.                             Hon. Judith E. Levy

Edys Renan Membrano Diaz,

        Defendant.
_____/

**Edys Renan Membreño Díaz's Sentencing Memorandum**

Edys Renan Membreño Díaz[1] immigrated to the United States in search of economic opportunities because his family lived in extreme poverty. He entered several times with a quick arrest and removal at the border. Each time, there were no criminal consequences and no opportunity to understand what his efforts could result in if he returned. He returned to the U.S. successfully to work in 2021. Sending remittances to his parents and family.

---

[1] There are many ways that Edys' name is written across court documents and jail/prison databases because of confusion on how to write it. For example, the Michigan Department of Corrections lists his first name as Diaz, middle name as EdysRenan, and last name as Membreno.
Edys Renan Membreño Díaz is the accurate spelling of his name and will be used throughout this memorandum.

1

The Probation Office calculated a sentencing guideline range of 24 to 30 months in this case (statutorily capped at 24 months) for unlawfully reentering the United States after removal. Counsel submits that a sentence of nineteen months concurrent with the state sentence Edys is currently serving in case 2022-282115-FH (Sixth Circuit Court, Pontiac, MI) is just and fulfills the "overarching" command of section 3553: that a sentence be "sufficient, but not greater than necessary" to fulfill the purposes of sentencing, that include retribution, deterrence, incapacitation, and rehabilitation. *Tapia v. United States*, 564 U.S. 319, 325 (2011).



Teenage Edys with his school uniform

## I.   Edys Renan Membreño Díaz's Background

Edys Renan Membreño Díaz is the result of a relationship between Electeria Díaz and Humberto Membreño. His birth occurred in the Municipality (*i.e.*, county) of San Francisco de Yojoa, Cortés, Honduras, a

2

rural agricultural area. The Department of Cortés is now a maquila hub (manufacturing and assembly plants), but that is mostly in the large city of San Pedro Sula and seaport areas. Edys grew up in the southern region, in a farming community where it took about three hours to travel to San Pedro Sula in the 1990s and early 2000s. He lived in extreme poverty with no resources.

Edys' early years consisted of assisting his family in farming. He worked with his father as a child in the farms of others because the Membreño Díaz family did not own their own farmland. By working the corn, beans, and coffee farms of others, his father received pay for the areas cleaned, planted, and harvested. His father provided a small amount of the money earned to Edys so he could buy himself clothing. Most of the time, Edys declined the money so the family could buy food. That is, to buy the minimum amount of food to live on when there were days that he missed many meals. He lived with the reality of one full new clothing outfit a year during Christmas in addition to a school uniform purchased for the academic year. Other clothing came from either a hand-me-down from older family member or donations.

The family lived in a shack with no running water, electricity, or gas: "At that time the house we had was built from mud and rods." Ex. A – Letter

3

from Dennis Membreño Díaz, at 003. Electricity came later as he grew older. Now, the situation is still dire but somewhat improved: "My parents are now elderly people who live in a home made from wood, provided by supportive aid from the local government, and which lacks basic improvements like a water storage tank and a washing machine and a toilet." Ex. A – Letter from Dennis Membreño Díaz, at 003.

Edys' childhood's instability, aside from poverty, stemmed from his father's abuse on him and others. The money earned by Humberto sometimes went misdirected to buying alcohol instead of supporting the family. As his older brother Dennis describes their father: "In his state of inebriation, he would mistreat us verbally and sometimes, physically. He would hit my mother in our presence." Ex. A – Letter from Dennis Membreño Díaz, at 003. These were "moments of panic, living intrafamilial violence accompanied by misery." Ex. A – Letter from Dennis Membreño Díaz, at 003. His mother describes that period as living with "a lot of violence from my spouse, humiliating mistreatment, terrorizing everyone with no help from the rest of the family. I didn't report him out of fear of something worse, receiving blows, but I never abandoned my young children when he was drunk from alcohol." Ex. A – Letter from Electeria Díaz, at 006. Edys did not have a way to escape the violence or desire to leave his mother alone. He

4

left to play with others his age, hid, or went to work when his father was angry or inebriated.

In terms of Edys' education, the family promised that he could receive an elementary education (six years), more so because his parents are of low literacy. Schooling, even public schooling, costs money: enrollment fees, books, school supplies, clothing, and other costs. A luxury for many with a number of children and living in poverty. Edys tried to learn as much as he could with the hope that family support eventually turned into further education and *potentially* a military career route. That was not meant to be. Parental support, however, ended after the sixth year because that took money away from their basic survival.

After Edys completed his sixth year, and that was with several periods of working in the farms, he attempted the equivalent of a middle school education but that too was difficult. Edys' brother Dennis notes, "Due to low financial resources, he couldn't continue his secondary education. I personally gave him lodging or a place to stay during the few classes he took. He just started them and then quit to keep working and surviving, helping his family. Because he traveled long distances to return to the family home, because the school day was some distance away, just on weekends. [He]

5

could not attend further schooling." Ex. A – Letter from Dennis Membreño Díaz, at 003.

At the age of 12, Edys turned to working fulltime in the fields. At age 16, he traveled further distances to work, sometimes not returning home because of the distance. Ex. A – Letter from Electeria Díaz, at 006 ("Edys left home to work at a great distance. Always in agricultural work. He would always visit us, he would give us money from what he earned over where he was working."). Dennis lived away from his parents because at that time he had an apartment near his work in exporting tilapia filets. The other siblings lived farther away in dangerous areas, including San Pedro Sula.

San Pedro Sula in the 2000s and 2010s was a particularly dangerous place for young men and women. More so if they were coming from rural communities because of targeting for violence, extortion, kidnappings, and lack of economic opportunities.[2] Some of the targeting occurred for unknown reasons as with Edys' brothers' killings in 2017. These murders occurred at age 22 for Edys and further fueled his eventual migration to the U.S. This all materialized during the difficult economic background of Honduras when

---

[2] *See, e.g.*, Carrie Kahn, *Violence in Honduran City San Pedro Sula Spurs Migrant Caravan*, NPR (Oct. 30, 2018), *available at* https://perma.cc/J386-9XUT; David Bacon, *If San Pedro Sula is Murder Capital of the World, Who Made It That Way*, THE AMERICAN PROSPECT (June 13, 2019), *available at* https://perma.cc/7KXC-UP9B;

6

Edys was a child and teenager. In fact, data in 2013 showed that "more than half of the Honduran population lived below the poverty line, with six out of ten, rural families living in extreme poverty." Marco Antonio Hernandez Ore et al., World Bank Group, HONDURAS: UNLOCKING ECONOMIC POTENTIAL FOR GREATER OPPORTUNITIES 13 (2016). The Membreño Díaz family fit squarely in that assessment. After the deaths of his brothers and further precarious economic situation for the family, Edys traveled north.

Edys left Honduras and did the arduous trip to the Mexico-U.S. border. Traveling thousands of miles. He attempted to cross into the U.S. several times beginning in 2019 to work. Each time he was arrested promptly by U.S. border agents, sometimes returned to Honduras and others to México through expedited removals. At one point, he worked in construction in México, earning enough to scrape by and provide some small remittances to his family. He eventually crossed into the U.S. and made it to Michigan in 2021.

Edys obtained work in construction and moved in with others working in the same area. He worked six days a week and earned approximately $1000 weekly. Aside from paying rent and basic subsistence, Edys sent the majority of the money earned as remittances to his parents and Dennis. Dennis lives the closest to their parents and takes a lead on providing them

7

care. The remittances provided "better conditions and to get ahead with a decent life, and to help us financially to obtain food and medications when they are needed, to control blood pressure. Mainly my parents, since to tell the truth we are of low income." Ex. A – Letter from Dennis Membreño Díaz, at 003. His mother further confirms the remittances sent: "When Edys would send me remittances, the truth is he was helping us a lot. He would send it every two weeks. My son Dennis would withdraw it and he would deliver it to us in cash." Ex. A – Letter from Electeria Díaz, at 006. Edys' incarceration exacerbates their poverty, but Dennis is finding ways to provide them support until he returns.

Edys will return to Honduras with a plan to work in a maquiladora. His secondary goal is to obtain additional education to apply for admission into military school. Military service, while dangerous, will provide him and his elderly parents the financial stability needed and another reason to ensure he stays in Honduras.

**II. A sentence sufficient but not greater than necessary in this case is accomplished with a sentence of 19 months concurrent with the state sentence he is serving.**

Edys pled guilty to the sole count of unlawful reentry after removal in violation of 8 U.S.C. § 1326(a) without a Rule 11 plea agreement with the government. He made his initial appearance and consented to federal

8

custody on March 11, 2025. By the time of sentencing, Edys will spend approximately 4 months and 26 days in federal custody at Sanilac County Jail.

This Court "may not presume that the Guidelines range is reasonable" but rather "must make an individualized assessment" of this case. *Gall v. United States*, 552 U.S. 38, 50 (2007). The punishment imposed "should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-488 (2011) (omitting citations). That is because the Sentencing Guidelines have a "real and pervasive effect . . . on sentencing." *Molina-Martinez v. United States*, 578 U.S. 189, 199 (2016).

*Advisory sentencing guidelines*: The Probation Office scored the base offense level as 8 (pursuant to U.S.S.G. § 2L1.2(a)); then added 10 levels (pursuant to U.S.S.G. § 2L1.2(b)(3)(A)) because Edys has one previous felony conviction with a sentence of 5 or more years. This puts the total offense level as 18 with a criminal history category of III (all criminal history points come from one case). When including the -3 for acceptance of responsibility, Probation's calculated advisory sentencing guidelines suggest an imprisonment range of 24 to 30 months, though that is capped at 24 months because of the statutory maximum.

9

Counsel provided a physical copy of the initial PSR to Edys and read it to him in Spanish. After discussing the report in person, counsel submitted corrections to the report writer.

There are no remaining objections, corrections, or additions to the final presentence report.

*Michigan state case sentence*: Edys is currently serving a state sentence at the Michigan Department of Corrections in Case 2022-282115-FH (Sixth Circuit Court, Pontiac, MI). While the government writes that the assaults occurred on two separate dates, that is *not* correct. Gov't Sent. Memo, ECF No. 20, PageID.84 (referencing events on July 15 and 17). It was all one assault on July 17, 2022. Any reference to July 15 is a typographical error from the court reporter in state court during the change of plea hearing, and the one July 17 event is confirmed by the context of the judge's remarks and the conviction paperwork. More importantly, they are not indicative of repetitive or ongoing assault across various days as impressed by the government's sentencing position.

Edys *is* ashamed that, while under the influence of alcohol, he committed the sexual and physical assault against another person. A woman he later learned suffers from cognitive impediments. Once Edys understood fully the gravity of his actions, he pled guilty less than two months after his

10

arrest to all three counts; the state court held no preliminary examination, no counts were dismissed, and no plea negotiations ensued before he pled guilty. A state court judge imposed a sentence less than three months from July 17: a 6- to 15-year sentence in the Michigan Department of Corrections. Counsel here spent considerable time discussing the underlying state case and details with Edys. Years removed from the incident, he remains deeply ashamed of what he did and asked that I explain to his family in Honduras the details of that prosecution and why he remains incarcerated.

When discussing what returning to the U.S. – after serving the sentences in these cases and removal – could result in terms of a new unlawful reentry federal prosecution, Edys further understood the additional time he could then face: a statutory maximum of 20 years and potential advisory sentencing guidelines of 63 to 78 months. Further legal problems or incarceration is not what he wants to risk in the future after his release.

*General and specific deterrence*: General deterrence "occurs when the decision maker contemplates the punishment experiences of others."[3] Consequently, general deterrence "does not concern a 'connection' between behavior and consequences, but whether potential consequences already

---

[3] Daniel S. Nagin & Greg Pogarsy, *Integrating Celerity, Impulsivity, an Extralegal Sanction Threats into a Model of General Deterrence*, 39 CRIMINOLOGY 865, 867 (2001).

11

recognized by the decision maker seem sufficiently 'costly' to deter behavior."[4]

Research shows that the "conforming influence" of extralegal consequences attendant to indictment and prosecution (shame, fear of peer disapproval, embarrassment, and social stigma) are far more effective than actual punishment in fostering general deterrence.[5] Even the Department of Justice recognizes that "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment."[6] What this means is that the real fear of being caught, the shame of admitting guilt, and the social stigma of prosecution, are all the preventative aspects of deterrence. Not what happens to a stranger who is caught and subsequently punished.[7]

While it is impossible to credibly predict what type of sentence will deter individuals like Edys from migrating to the U.S., this was a deeply personal decision for economic survival and to help his family. This is why he attempted and did reenter the U.S. several times only for it to quickly lead

---

[4] *Id.*

[5] *Id.* at 869.

[6] NAT'L INSTITUTE OF JUSTICE, *Five Things About Deterrence* (Jun. 5, 2016), *available at* https://nij.ojp.gov/topics/articles/five-things-about-deterrence (last accessed December 29, 2024).

[7] Valerie Wright, Ph.D.: *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment,* THE SENTENCING PROJECT (Nov. 2010), *available at* http://www.antoniocasella.eu/nume/Wright_2010.pdf.

to detention and expedited removal at the border. In none of those detentions were there criminal consequences. It was in those instances, like in this case, a status offense that is now transformed into a criminal case with its own repercussions, years after being found in 2022.

Here, Edys appeared in federal court confused in March 2025 because his time in state custody at that point neared three years. He did not understand how a federal case ensued when the federal government knew of him since his arrest on July 17, 2022. He now understands that the federal government will prosecute unlawful reentry cases, even years after being found in the U.S. and even while serving lengthy state sentences.

During these almost five months in federal custody in a county jail, there is no programming, no recreation, and limited access to call his family. All of it time served in an enclosed pod. Hard time for anyone and more so for someone like him that is a monolingual Spanish speaker with limited persons to speak with in that jail. He decided to stay in federal custody, instead of returning to the MDOC, for fear of not having access to counsel and because he wanted to resolve this matter expeditiously.

*Protecting the community*: As there is no specific victim in this case, the focus is on protecting the community at large, arguably. Edys' carceral detention since 2022, and continued state sentence with a projected release

on July 23, 2028 (and a maximum discharge date of July 23, 2037) protects the community from any threat. Edys will also be removed to Honduras through the immigration process approximately one or two months after completing the state and federal sentences.

*Experience in the BOP during incarceration*: Edys' experience at the MDOC currently is of practically no programming, aside from some AA group talk. He is able to do some basic work assignments as told by correctional staff but because of his limited understanding of the English language, educational and vocational programming is not available to him, nor is any type of substantive treatment.

If Edys were sentenced in a consecutive manner to serve this federal sentence, the experience will be the same at the BOP. Because of his noncitizen status and status as subject to removal, it will limit his ability to participate in job-training and rehabilitative programs. *See*, *e.g.*, 28 C.F.R. § 345.35 (excluding from prison employment people "currently under an order of deportation, exclusion, or removal"); 28 C.F.R. § 544.51 (prisoners with removal orders are potentially considered for educational programming *if* BOP resources "permit after meeting the needs of other eligible inmates").

Current BOP budgetary reductions will further limit Edys' programming inclusion, even in isolated form. That is the result of budgetary cuts across the federal government that are currently resulting in staff reductions and forthcoming programming limits.[8] Another barrier is that he will need to pass, in the English language, multiple subject tests to obtain a GED before programming eligibility. Moreover, there is no halfway house placement or any other transition to community life in his future because of his immigration status.

---

[8] The pressure to address a budgetary shortfall is impacting both incarcerated individuals and BOP staff. For example, the BOP on March 31, 2025, implemented a policy that reduces the maximum a prisoner could be placed at a Residential Reentry Center (halfway house) to a limit of 60 placement days through the Second Chance Act instead of the 365 placement days. This will also affect RDAP participants. Bianca Shoulders, BOP Administrator Residential Reentry Management Reentry Services Division, Updated Guidance on Community-Based Population Management (Mar. 31, 2025) ("Effective immediately, all inmates releasing to the community under Second Chance Act (SCA) authority after April 21, 2025, will have dates adjusted in order to bring the Residential Reentry Management Branch cost centers into alignment with the [BOP] appropriated funding levels until further notice."). And thousands of BOP employees will see reductions their paychecks, up to 25%, beginning March 23, 2025. Sarah Roebuck, Corrections1, *BOP slashes retention bonuses, impacting thousands of correctional officers* (Feb. 27, 2025), *available at* https://perma.cc/BF4E-AUVX. The new BOP released directive to increase home confinement placements for prisoners with First Step Act credits that do not need RRC placement is still unclear in implementation, or how many persons it will actually impact. BOP, Federal Bureau of Prisons Issues Directive to Expand Home Confinement, Advance First Step Act (May 28, 2025), *available at* https://perma.cc/KC5Z-D8ST.

More importantly, as the government acknowledges, once he completes his state and federal sentence, Edys will be removed. Removal from the U.S. was assured even before this federal case as he was told an ICE detainer lodged after his arrest in July 2022.

Given these realities for Edys, he requests that the Court enter a sentence in this case that is fully concurrent with the state sentence, as allowed under U.S.S.G. § 5G1.3(d), with no supervised release term to follow, U.S.S.G. §§ 5G1.3(d).

## Conclusion

Counsel requests that this Court sentence Edys to no more than nineteen months and that such sentence enter as concurrent with the current state sentence he is serving. It is a variance from the advisory guideline range but aptly supported and in consideration of the time served in federal custody in this case.

Submitted,

s/ Fabián Rentería Franco
Fabián Rentería Franco
Counsel for Edys Membreño Díaz
FEDERAL COMMUNITY DEFENDER
613 Abbott St., Suite 500
Detroit, MI 48226
T: (313) 463-6143
E: Fabian_Renteria_Franco@fd.org

Dated: July 30, 2025

## Certificate of Service

I certify that on July 30, 2025, the following documents

- Edys Membreño Díaz's Sentencing Memorandum
- Exhibits to Sentencing Memorandum

were filed with the Clerk of the Court using the CM/ECF system, which should send notification to opposing counsel of record.

s/ Fabián Rentería Franco
Fabián Rentería Franco
